Case number 24-5668, United States of America v. Milder EscobarTemal. Argument is not to exceed 15 minutes per side. Mr. Thomason, you may proceed for the appellant. Good morning, Your Honors, and may it please the Court. Alex Thomason on behalf of the appellant, Milder EscobarTemal. I'd like to reserve four minutes for rebuttal. This case concerns the constitutionality of the Alien in Possession Statute, and I think it effectively presents two issues. The first is whether undocumented immigrants are part of the people who the Second Amendment protects, and if so, under what circumstances. Given the Second Amendment's text, its historical meaning, and precedent, I think that this Court should find that, at the very least, undocumented immigrants who have strong ties to America are part of the Second Amendment's people. Applying that standard here, I think this Court should find that my client has sufficient connection, and therefore has Second Amendment rights. The second question is whether the government has met its burden of showing that categorically disarming undocumented immigrants is consistent with history and tradition. In Williams, this Court reviewed the exact same body of historical evidence that the government is relying on here to justify the Alien in Possession Statute's constitutionality, and said that the relevant principle to be derived from that body of evidence is that Congress can disarm categorically groups who have demonstrated a propensity for violence, but that when it does so, individuals within the group must be given an opportunity to show that they don't meet that class-wide generalization. Here, I don't think that the government has met its burden of showing that undocumented immigrants is consistent with that history, because it hasn't shown that undocumented immigrants as a class are somehow more dangerous than the general population. But should this Court agree? Is dangerousness, can it be divided categorically into dangers that relate to felons and violence, for example, and then other historical views of what people could also be disarmed based on their refusal to swear a loyalty oath? Meaning that they're in a group of people that may be part of the community, but that they are not regulable. The government is unable to assure that they can be regulated in the way that the general populace can, and that that places them in a disarmable category without regard to whether they are personally violent. I certainly understand the point. The way I read Williams is I think it correctly identifies at the right level of generality what our historical firearm tradition shows. So like, for instance, the oath-requiring laws, there was a 17, I think 77, or maybe a little bit later, 97 oath-requiring law from Pennsylvania that was discussed in that case that talked about, yes, people who don't give oaths, the reason we can't trust them with guns is because they're likely to be hostile. They're likely to be loyalists. And I think if you were to read a different principle into those laws, a principle such as, well, but we don't know much about these people or something like that, I think we start to read history at too broad of a level of generality, and that becomes somewhat unworkable and unwieldy. I would also note that under Williams, the broader relevant – I mean, that's one way of thinking of it, I grant you. But you can also think of it right is that there was a loyalty component. In other words, Judge Stranch's first question, you could have two different components. And it seems to me if a lot of those laws, upon retaking the oath, you could get back your rights. So why doesn't that go to it? Yes, so two points on that. First of all, I think if we go back to Bruin and Rahimi, we do have to compare the underlying purposes of the law. And as I understand 922G5A, it is not a law that is about disarming people who are somehow disloyal. The legislative history shows the point of this law is to disarm presumptively risky groups and to suppress armed violence. So I think that the rationale behind 922G5A is dangerousness in the same sense that 922G1 is dangerous. But to your point, Judge Thapar, if you want to read the history of disarming people who wouldn't take loyalty oaths, as saying, yeah, this group can be disarmed because they lack some type of allegiance, I still think that what Williams stands for, and I think this is a quote that I've committed to memory, the relevant principle to be derived from our history of firearms regulation is that when Congress disarms on a class-wide basis, individual members within the group must be given an opportunity to show that they don't meet the class-wide generalization. Sorry, I'm sorry. You want to finish what you were saying? Yeah, I think my final thought on that would be, so if the policy that supports the law is a lack of allegiance, people who are here without documentation should be given the opportunity to show that they have some allegiance to the United States, despite their lack of citizenship or documented status. Just like felons, yes, they're felons, but they should be given the opportunity to show that they're perhaps not dangerous in the way that we think of felons. As to – you're done, right? Yes, yes, I'm sorry. Okay, no, it kind of follows. So what do you do – I want to go back to the people point. What do you do with the language in Turner that basically says you're not part of the people if you're illegal? I mean, I can read you the direct quote, but I'm not sure if you're aware of it. I'm not sure that I am exactly aware of – I'm not sure that I recall that case, the Turner case. I thought it was Turner v. Williams. Let me give you the quote, and then – sorry, I've got it in here somewhere. In Turner, the alien argued that they had a First Amendment right, and the court held that he did not, and I'm quoting, not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law. Sure, I think – And that's a 1904 Turner v. Williams. Okay, certainly. So my response to that would be that every circuit to have addressed the issue with respect to the Fourth Amendment, which I think that the Fourth and Second are really good comparators. The First is as well. Of course, they all use the phrase the people. I'm not sure if Turner was about the right to peaceably assemble or not, which is – But is it fair that we should – and I'm sorry to interrupt. Is it fair to use the – I mean should we assume that the people is consistent throughout the Constitution? I think so. I mean Williams says as such. So how do you deal with we the people? Because it's pretty clear that illegals weren't part of we the people. I'm not sure that I would agree with that, Judge Tappara. And just to push back a little bit, when you look at the founding era regulations of aliens, I think one of the earliest laws was the Alien Friends Act. And what that law said was that the executive can essentially – the president can essentially say, this is a person who we don't know is dangerous. We can seize them. Can I go back? Because your point is, well, it's similar to the Fourth, but not to the First. But they use the people in both. They do. And I guess the reason I rely on the Fourth is because Williams says, you know, it would be implausible to think that just because someone is a felon they're not part of the people. That would mean that a felon loses – But felons are different, right? Because felons are citizens, presumably, in the Williams case definitely. But the Ninth Amendment, the retention of the rights to the people that aren't given to the government, obviously originates in some sense from we the people, although Madison wrote the Bill of Rights later. But the point being is that – and then the Tenth Amendment, the rights reserved to the states or the people. And then maybe the hardest one for you might be Article I, Section 2, which says people choose the legislators, right, but the apportionment is done based on persons. So in the same clause, they're differentiating between the people who choose the legislators, which we know are citizens, and the persons – I'm sorry – the persons who we do apportionment are, which includes much a broader category. Absolutely. And so with respect to Article I, Section 2, that was addressed in Heller in distinguishing the people who can vote for congressional representation and the people as used in the Bill of Rights. And how Heller distinguished it was that's talking about the reservation of a power, not the exercise of a right. And I think if we go back and think about this in terms of Heller, I think the ultimate proposition – That was on the individual versus the collective point, right? And about reservations of rights, yes. And in the same way, if we go back to the very beginning, the whole idea here is that the Second Amendment is supposed to codify a preexisting right. And I guess where I struggle with this is that my client came to America over ten years ago. He worked a job. He didn't commit any crimes. He had guns in his home. That's core Second Amendment conduct. And he had guns in his home to protect himself and his family. Can I just go back one more time to Turner, though? What do we do with Turner? Because that is a holding of the Supreme Court. But if you came here illegally, you're not part of the people. I think what I would say about that is that in the other context – well, I guess I would go to Verdugo and Heller, because Verdugo and Heller both talk about the people is this term of art, and it is used to define a group who are part of the national community and people who have sufficient connections to be part of that community. And I know that Verdugo is kind of confusing. That wasn't exactly a holding because Justice Kennedy can – Can you become part of the national community without an oath of allegiance, without being invited in? I mean it's like to be a group, to be part of a group, you both have to want in and they have to let you in. I mean that's what – when you look at Turner, you look at Verdugo, you look at the other Supreme Court cases. There are a couple of other Supreme Court cases talking about this, and Justice Murphy specifically talks about that. Sure. I think so. I mean the way I read Verdugo is essentially saying there is a proxy for membership. It was long thought of, I believe, as being within the territorial presence, and that was Madison's debates on the constitutionality of the Alien and Sedition Acts. You know, what we're looking at is if you're here, you're bound by our laws, therefore you should be protected by our constitution. And you are sufficiently attached to our nation by participating in the life of the national community. And so where does that draw from? That seems to me to be the overarching concept in the law. Certainly, and I'm about out of time. So I think at the founding generation, right, people weren't quite as mobile. And so you would look at presence within a territory as being, look, if you're here, you're bound by our obligations, so therefore you are entitled to the protections of our constitution. I think Verdugo sort of – in some sense I almost read it as a way of saying, let's come up with a different proxy for membership. Being within the territory isn't alone, and I would say even lawful presence isn't enough because the defendant in the Verdugo case was in America lawfully. So I think that that shows by itself, you know, immigration status is not really the focal point. I really read Verdugo as almost borrowing from, like, the concept of personal jurisdiction. We used to think about it in terms of territory, but as people become more mobile and more people are coming in and out, we should look at how strong are their community ties, how long have they been here, and what have they been doing since they've been here. I realize that this is a very complicated case, and it's vexed the courts, both on the people question and the history and tradition question. But in closing, I'd just like to say all I'm asking for the court to hold is that at the very least, undocumented immigrants who have strong ties to their communities are participating in life the way any citizen might, who have no prior record of criminal behavior. And I think importantly here, we're not using the firearm in an improper or unlawful way, should be allowed to have firearms in their homes to protect themselves without subjecting themselves to a felony conviction and a potential 15-year sentence. I'll reserve the balance of my time. Good morning, Your Honors. May it please the court. Nick Golden on behalf of the United States. The district court in this case properly rejected the defendant's facial challenge to 18 U.S.C. section 922 G5A. On appeal, the defendant is seeking to press an as-applied challenge statute to that as well, but he didn't make that argument below, and when he entered his conditional guilty plea under Rule 11A2, he reserved only his right to appeal the denial of his motion to dismiss. So that as-applied challenge is not properly before this court. I'll talk about the facial and the applied challenge this morning, but I want to start with the facial challenge. The district court below- Let me ask, would you agree that Heller recognizes that the Second Amendment is coextensive with the First and the Fourth? I think there is language in Heller to that effect, Your Honor, but our position is that it is possible to interpret the people differently in the First, Second, and Fourth Amendments. I don't think that Heller specifically had in mind the distinction between citizens and noncitizens, or certainly not a distinction between noncitizens who are in the country lawfully as compared to unlawfully. Why wouldn't we apply the canon of consistent usage and apply it consistently throughout? Well, I think as Your Honor has already pointed out this morning, there is inconsistent usage already with the people being used in different ways in the Constitution, like Article I, Section 2, as Your Honor pointed out. Yeah, but that's-I mean, I don't necessarily-I mean, I don't necessarily view that- I get that you can use the term in different ways, but it still-isn't there a presumption that it has the same meaning? In fact, the Supreme Court said that in Verdugo. Again, in Verdugo, I also think the court was not-didn't necessarily have the citizen versus noncitizen distinction in mind, so I don't think the court should overread statements to that effect in Verdugo, Riquidez, and in Heller. I'm struggling with looking at the direct language of the case, and your thought that there may be-there might not have been this particular situation in mind. When the Supreme Court says these are coextensive amendments, doesn't that mean what it says? Well- Do you get to go back and say, oh, but you weren't thinking about this, and now we're going to make an exception for that? I don't think the Supreme Court would be happy with-or the ability to understand the law and to have told people what it is they can expect from the law. When the law says these are three coextensive things, then you have informed the public of that right, correct? I understand the point, Your Honor. I think that this court and other courts recognize that oftentimes when courts are speaking, they're not clarifying the law in the same way that a statute would, and so the fact that a statement is made in one case doesn't necessarily mean it will apply when there's a different case and distinction at issue. But if I could just maybe come at the point a different way. In Heller, when the Supreme Court was thinking about who is part of the people, the court in Heller specifically said we're looking at the political community and we're looking to see whether there are sufficient connections to the political community. And so I think it's possible to conclude that the Second Amendment right, which Heller also makes clear, is connected to citizenship and membership in the polity in a way that some other constitutional rights may not be. There could be a distinction that could be drawn there. And are there not other references to the national community as opposed to a political community? Yes, Your Honor. Heller does refer to both the political community and the national community. It refers to the national community when quoting Verdugo-Riquidez. We think that the court's addition of political community is important, in particular given that it was a Second Amendment case. Haven't we in the Sixth Circuit, in I think it was Rita, suppressed evidence obtained during a search under a Fourth Amendment for aliens unlawfully in the country? Your Honor, we recognize that the question of who is part of the people for purposes of the Fourth Amendment is an important question. Was that presented in that case? I'm not certain, Your Honor. We have done it, but I don't know that the issue's been squarely presented. I don't understand why you wouldn't just embrace the people and then say the Supreme Court answered it in Turner. I recognize you don't cite Turner in your brief. Yes, I think Turner is significant. I would also point out, Your Honor, that in Verdugo-Riquidez, the court cited Turner for the same proposition that Your Honor is suggesting, that aliens who are excludable from the United States don't have rights under the First Amendment. Again, that's why I think it's possible to have different results under the people in different amendments. Yes, but you have a clear holding of the Supreme Court that aliens are not included in the people. I don't understand how the Seventh Circuit got around it, for example. Your Honor is referring to the Meza-Rodriguez case. We think the fundamental error there was that the court in Meza-Rodriguez relied on the defendant's physical, familial, economic connections to the United States. That's why we think the reference to political community in Heller is significant, because if you're looking for sufficient connections to the political community, then connections like familial, economic, physical connections are not going to get you there. Staying on Bruin, step one, we do think that the Supreme Court's consistent usage of the terms Americans and citizens in all of its recent Second Amendment cases from Heller through Rahimi is important and something this court should pay attention to. I think this court in Williams recently reiterated a lot of that. And then we also think that the historical tradition is important here. We've laid out the history in our brief at pages 16 to 18. There is a longstanding tradition from England through the colonies to the early American states of disarming those who were not members of the political community, including aliens. In particular, I would point the court to the Eleventh Circuit's opinion in Jimenez-Chalon, which goes through a lot of the same evidence, and Judge Wenashe's concurrence for the Second Circuit in Perez goes through a lot of that evidence as well. But isn't there a different test going on historically that they're looking to the exclusion in the historical tradition from firearms ownership had to do with people who were outside the reach, so to speak, right? Native Americans, potentially dangerous Catholics, do their fealty to the Pope as opposed to the country. Don't you think that those things have to do with different categories of people and their regulability, whether they can be reached by regulation? I think that is relevant, but I don't think that's the whole story. I think starting from the English Bill of Rights, 1689, which Heller recognizes as the predecessor of the Second Amendment, that was limited to subjects, which I think is a term that you might use under a monarchy. Here we use citizen because we have a Republican form of government, but I think it's an analogous concept. I think the Oath of Allegiance laws, those disarmed anybody who wouldn't take the Oath of Allegiance. It wasn't limited to specific categories of people. But it was people who were present, right? People who had sufficient contacts. There are two tiers here. If you say unlawfully present aliens can never, you can automatically do that. That avoids the real question that the case law addresses now, which is whether, like other immigrants of which our nation is made up, how we began and how we continue to exist, whether they are sufficiently contacts to the country to be a part of our national community. Why isn't that the governing test now? Your Honor, I understand the question, but I think that Heller's addition of political community and the nature of the Second Amendment right as being uniquely associated with citizenship affects the analysis in the Second Amendment context. When you're talking about aliens who are unlawfully present in the United States, they can't vote in federal elections. They can't hold federal office. They can't serve on federal juries. They can be removed from the country at any time. So we just don't think that, as a category, they're going to have sufficient connections to the political community. And even if the court wanted to use the national community standard. Didn't Ardo say it's an individual right? Yes. All of those are collective. Well, I agree, but at the same time, Heller also said that when we're thinking about the people, we're looking for connections to the political community. Or the national community also. Well, yes, Your Honor, it did use national community also. And if the court were more inclined to use national community, I still think they're not sufficiently connected, just because I think there's kind of almost a common sense intuition that when somebody enters the country in violation of law and can be removed at any time, that those are not going to be sufficient connections to the national community. I do want to move on to Bruin Step 2. We've identified two principles there that we think the court can apply to uphold. Section 922G5A. The first is being outside of the political community, which is what we've just been talking about. The second is the dangerousness principle, which this court obviously adopted in Williams. We think the court could use either of those two principles. We think that being outside of the political community is the more natural analog here. But we do think the dangerousness principle would work as well. But either way, importantly, we do not think that Section 922G5A is susceptible to as-applied challenges. If the court goes with the membership in the political community principle, then we think there's just a one-to-one fit between the people, the individuals who are disarmed under Section 922G5A and the principle of people who are outside the political community. If the court goes with the dangerousness principle, we would urge the court not to import the Williams as-applied regime into Section 922G5A wholesale, which is what the defendant is asking for. Williams recognized that under G1, people are being put into that category because they have convictions. And under those circumstances, it makes sense to look at their convictions to try to figure out if they're dangerous. Here in G5A, we're not looking at people People aren't being put in the category that's disarmed because of their prior convictions, so we don't think it would make a lot of sense to Let's put aside the first part then and tell me what is it that people are being placed in the dangerousness category for. Yes, Your Honor. I think there are three points I'd make on that issue. I think the first one is that anybody who is in the country unlawfully has kind of a permanent incentive to avoid contact with law enforcement. Any contact with law enforcement could lead to their being identified as unlawfully present, potentially arrested and removed from the country. So we think it's inherently dangerous for people in that under those circumstances to be armed when they're potentially coming in contact with law enforcement. I would point the court to Section 922G2, which disarms fugitives from justice. We think that's kind of an analogous concept there. In addition, Congress has, as the court knows, a reticulated regulatory regime to govern the sale and disposition of firearms in the United States. Things like background checks, record-keeping requirements, identification requirements. And people who are in the United States unlawfully are just not going to be able to participate in that system. They're not going to have identification, social security numbers, things like that. So we think that to the extent they're going to have firearms, it's going to be outside of that regulated stream which Congress put in place to keep the public safe. So it's categorically unregulable is the issue?  That's one issue, yes. And the final point is just that if an alien is unlawfully present in the United States, then they have already probably violated one law. And we do think it's fair for Congress to conclude that, on average, they're more likely to potentially violate another law. I think the statistical evidence is not at all supportive of finding that as a dangerousness factor. Isn't the statistical evidence pretty clear that you're a lot more likely to have violent results or to see violence in communities that are not unlawful aliens? I don't think this Court has required statistical evidence in other contexts. I don't think Williams looked for statistical evidence to conclude that Congress, you know, was entitled to make a categorical judgment. So we don't think that statistical evidence is required on that point. But I would – that's kind of the third of – Even if it's disputed. Even if it's disputed, Your Honor. I did just want to – I wanted to emphasize that we do not think this is a permanent disarmament, even of people who fall under 922G5A. If anyone who falls within that class takes steps to become lawfully present, then they'll come outside of 922G5A, and they would no longer be disarmed. Almost like the old oaths, right? Yes, Your Honor. Exactly. Exactly analogous to that. So I see I'm running out of time. If the Court has no further questions, we would ask the District Court's judgment be affirmed. I do have one question, and you are out of time. Go ahead, please. On the regulability aspect of it, I know that you didn't make this argument, but did you – have you researched or considered whether or not there is a history and tradition of use of the government resources for those who fall within the political community? I'm sorry. I'm not sure I understand. So, in other words, you listed kind of like all the regulations. There's a bunch of federal regulations that do have to do with, you know, ownership of firearms and those kinds of things. Did you look at around the founding time, the 1700s, and kind of coming forward this way, whether or not there is a premise that could be made based upon the use of government resources? We did not look at that, Your Honor. Okay. Thank you. I want to begin by addressing one sort of broad comment that opposing counsel made, which is that there is a history and tradition of disarming aliens. I mean, I'm not a historian, right? I'm a federal public defender, but I researched this issue as best I could. I did not find any laws from the founding era that said that foreigners who come here are not allowed to have guns or somehow don't have arms-bearing rights. I do want to point out, though, and I think it's important to note, that the founding generation did regulate foreigners. The 1798 Naturalization Act said, you know, when you come here, when you arrive from overseas, you need to go to the clerk of the district court closest to your residence, and this is in Section 4 of the Act, and it was passed alongside the alien- You didn't have immigration laws then, right? So you could come here freely, like the Chinese came without immigration law restrictions. So now we have laws barring you, and if you look at what Justice Murphy says in Bridges, I mean, he talks about the fact that people who come here lawfully and comply with our requirements by nature are different than people who break the law to come into the country. But that's the point I'm trying to make. There was a 1798 law, the Naturalization Act of 1798, that says when you come here, and I grant it, you know, there's not a distinction between coming lawfully or unlawfully, but when you get here, you need to report your presence. You need to announce that you're here by telling the clerk of the district court. The punishment for that was not loss of rights. It was a $2 fine. Likewise, people who came here, foreigners, were subject to the surety regime that we're all now familiar with since it was discussed extensively in the Rahimi case, and that kind of goes to your point, Judge Stranz. The loyalty oath law is applied to both citizens and noncitizens. If you look at the Pennsylvania law, it just says persons. People who are here need to pledge some sort of allegiance, and I understand now maybe we might look at citizenship status to determine that, but that's a very modern invention. The visa requirement did not exist until 1924. Of course, in the late 1800s, there were restrictions on Chinese immigrants coming here, but what I would say about that is that in a long line of cases, the Supreme Court recognized that all those people, while here, whether or not illegally, are entitled to the Fourth, Fifth, and Sixth Amendments protections. I think particularly the cases, there was one that I noted to sort of rebut the point about they can be deported at any time. That's true, but I think it was the Kuang Lung Foo case. The Supreme Court said just because you can be deported at any time doesn't mean that while you're here you're not entitled to the protections of the Constitution. At the end of the day, and I only have a minute left, but I do want to reiterate what I'm asking this court to do. This case can be decided on very narrow grounds. All I'm asking the court to find is that people who come here and have developed strong ties to their community, maybe they can't vote, maybe they can't serve on juries, but felons can't either, and they are part of the people. That's what Williams says. While they're here, if they establish strong connections, they're not out committing crimes, doing things that are violent, and I think it's important here. I'm sorry to interrupt you. Can I ask you just a quick question about maybe your client, you could answer this. Did he go through a background check? To purchase his firearm? Yeah. The interesting point about that, and this kind of goes to the regulability concern, Tennessee state law does not at all regulate private firearm transactions, and there's no federal law to my understanding that governs that either. So, for instance, it's very easy. It was a private transaction. Is that what you said? That is my assumption. Because, yeah, if he had bought it from a federally licensed dealer, there would have been a background check. But, I mean, that just goes to the point, you know, and I think Judge Davis and Judge Strange, you were talking about this. It's not heavily regulated. It's pretty easy to legally purchase a gun in Tennessee. Maybe, and I see I'm out of time. I appreciate your argument. Thank you. I mean, maybe you're a prohibited person, but the purchase itself is not illegal. Again, at the end of the day, I think that this case can be resolved on very narrow grounds. Persons who come to America and develop strong ties with their community and who have no prior record of criminal behavior and who are doing nothing more than possessing a firearm in the sanctity of their own homes in order to defend themselves and their families should not be subject to a felony conviction with a 15-year potential sentence. And that's all. Thank you very much. Thank you. We thank you both for your interesting opinions and arguments and briefs. It is an interesting case, and we will take it under advisement.